FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

# Dec 12, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

PATRICE B.,[1]

               Plaintiff,

v.

CAROLYN COLVIN, Acting
Commissioner of Social Security[2],

               Defendant.

No.   2:24-cv-00164-EFS

**ORDER REVERSING THE ALJ'S
DENIAL OF BENEFITS, AND
REMANDING FOR FURTHER
PROCEEDINGS**

Due to degenerative disc disease, status post right ankle fracture, obesity,

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] Carolyn Colvin became the Acting Commissioner of Social Security on November 30, 2024. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, and section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), she is hereby substituted for Martin O'Malley as the defendant.

chronic pain syndrome, irritable bowel syndrome, herpes zoster, cellulitis, hypertension, hypercholesterolemia, acute encephalopathy, anxiety disorder, and depression, Plaintiff Patrice B. claims that she is unable to work fulltime and applied for disability insurance benefits.[3] She appeals the denial of benefits by the Administrative Law Judge (ALJ) on the grounds that the ALJ made an error at step two when he found that her medically determinable impairments were nonsevere, the ALJ improperly assessed Plaintiff's credibility, and the ALJ improperly relied on the medical expert testimony of Dr. Goldstein. As is explained below, the ALJ erred. This matter is remanded for further proceedings.

## I.    Background

In March 2020, Plaintiff filed applications for benefits under Title 2 and Title 16, claiming disability beginning February 1, 2020,[4] based on the physical and mental impairments noted above.[5]

The agency found on March 17, 2021, that for purposes of the Title 16 claim, Plaintiff was rated to sedentary work and allowed benefits pursuant to the

---

[3] Plaintiff was found to be disabled on a date later than the date last insured and is medically eligible for Supplemental Security Income Benefits but does not meet the income and asset limits to receive those benefits.

[4] Plaintiff later amended her alleged onset date to February 12, 2014, a date prior to the date last insured of March 31, 2016. AR 15, 36.

[5] AR 231, 238, 294.

Medical-Vocational Guidelines.[6] The agency denied the Title 2 claim at both the initial and reconsideration levels.[7] After the agency denied Plaintiff benefits, Plaintiff appeared on June 14, 2023, with her attorney for a hearing before ALJ Donna Walker.[8] Plaintiff testified, and a medical expert, Allen Goldstein, MD, testified.[9] At the hearing Plaintiff amended her onset date to February 12, 2014, which rendered the relevant time period to be between February 12, 2014, and the date last insured of March 31, 2016.[10]

Plaintiff testified that in 2014 to 2016 she had post-herpes neuralgia in her arms and legs.[11] She said she was getting outbreaks frequently and that the areas would itch and burn and be blistered.[12] The symptoms would start on her arm and spread from her shoulder to torso and legs.[13] She said that stress and depression had a lot to do with her flare-ups.[14] Plaintiff said she had edema in her legs and

---

[6] AR 83-84.

[7] AR 121, 129.

[8] AR 33-58.

[9] *Id.*

[10] AR 36.

[11] AR 51.

[12] *Id.*

[13] AR 51-52.

[14] AR 52.

her ankles would swell and that she had to reduce her salt intake and elevate her legs for 15 to 20 minutes at least a couple times a day.[15] She said that she elevated her legs when the symptoms got "bad" and that she had to elevate her legs to heart level.[16] Plaintiff said she was taking four to five pain pills a day and that they affected her ability to focus.[17] She said that the pills made her tired and she did not remember things as well as she used to.[18] She said that about two days a week, on days when the pain was bad, she would unintentionally fall asleep during the day.[19]

Plaintiff said that when she elevated her legs due to swelling it also helped her back pain.[20] She said that the pain started in her low back and would radiate into her buttocks and down her leg.[21] She said that on a typical day she would have been able to stand or walk for 15 to 20 minutes before she had to sit down.[22] In

---

[15] *Id.*

[16] AR 52-53.

[17] AR 53.

[18] *Id.*

[19] AR 53-54.

[20] AR 54.

[21] *Id.*

[22] AR 55.

2015, she tried to walk for 1 mile 3 times a week, but she had to stop.[23] She said that she was able to lift about 10 to 15 pounds back then and it has gotten worse since.[24]

On June 28, 2023, ALJ Walker issued an unfavorable decision.[25] The ALJ found Plaintiff's alleged symptoms were not entirely consistent with the medical evidence and the other evidence.[26] As to medical opinions, the ALJ found:

- The opinions of Allen Goldstein, MD, to be persuasive.

- The opinions of state agency consultants Merry Alto, MD, and Myron Watkins, MD, to be somewhat persuasive.

- The December 2011 opinions of consultative examiner Jonathan W. Anderson, PhD, of limited persuasiveness for the period at issue.

- The November 2018 opinions of consultative examiner Amy Dowell, MD, of limited persuasiveness.

- The September 2018 opinions of consultative examiner Megan Sakamoto-Chun, MD, to be unpersuasive for the period at issue.

- The February 2023 opinions of Alex Luger, MD, unpersuasive.

---

[23] *Id.*

[24] *Id.*

[25] AR 12-32.  Per 20 C.F.R. § 404.1520(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[26] AR 19-22.

- The August 2015 opinion of Angella Julagay, APRN, that Plaintiff should elevate her legs in the evening "as much as possible" unpersuasive.[27]

As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff last met the insured status requirements of the Act on March 31, 2016.

- Also at step one: Plaintiff had not engaged in substantial gainful activity from her alleged onset date of February 12, 2014, through her date last insured of March 31, 2016.

- Step two: Plaintiff had the following medically determinable severe impairments: degenerative disc disease, status post right ankle fracture, obesity, chronic pain syndrome, irritable bowel syndrome, herpes zoster, cellulitis, hypertension, hypercholesterolemia, acute encephalopathy, anxiety disorder, and depression.

Also at step two, the ALJ found that none of Plaintiff's medically determinable impairments limited her ability to perform any basic work function for 12 consecutive months, and therefore she did not have a severe impairment or combination of impairments. Thus, the ALJ found that Plaintiff was not under a disability at any time from the alleged onset date of February 12, 2014, through

---

[27] AR 22-24.

DISPOSITIVE ORDER - 6

1  the date last insured of March 31, 2016.[28]

2    Plaintiff timely requested review of the ALJ's decision by the Appeals

3  Council and now this Court.[29]

4  ## II.    Standard of Review

5    The ALJ's decision is reversed "only if it is not supported by substantial

6  evidence or is based on legal error,"[30] and such error impacted the nondisability

7  determination.[31] Substantial evidence is "more than a mere scintilla but less than a

8  preponderance; it is such relevant evidence as a reasonable mind might accept as

9  adequate to support a conclusion."[32]

10

11  [28] AR 17-25.

12  [29] AR 226.

13  [30] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

14  [31] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ), *superseded on other*

15  *grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an

16  ALJ decision due to a harmless error—one that "is inconsequential to the ultimate

17  nondisability determination").

18  [32] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir.

19  1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The

20  court "must consider the entire record as a whole, weighing both the evidence that

21  supports and the evidence that detracts from the Commissioner's conclusion," not

22  simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*,

23

1

### III.    Analysis

2    Plaintiff seeks relief from the denial of disability on several grounds. She

3    argues the ALJ erred at step two, when evaluating Plaintiff's subjective

4    complaints, and when evaluating the medical opinions.  The Commissioner argues

5    there was no error because the ALJ's step-two findings were proper; the ALJ

6    properly evaluated Plaintiff's subjective complaints and considered the

7    inconsistency of her statements with the medical record; and the ALJ properly

8    evaluated the opinion evidence.  The Court disagrees with the Commissioner. As is

9    explained below, the ALJ's analysis contains consequential error.

10   **A.    Step Two (Severe Impairment): Plaintiff establishes consequential**

11   **error.**

12    Plaintiff argues that the ALJ erred at step two by failing to find her chronic

13   pain syndrome and postherpetic neuralgia to be severe impairments. The Court

14   agrees.

15    1.    <u>Standard</u>

16    At step two of the sequential process, the ALJ determines whether the

17   claimant suffers from a "severe" impairment, i.e., one that significantly limits her

18   physical or mental ability to do basic work activities.[33] This involves a two-step

19   _____

20   143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does

21   not indicate that such evidence was not considered[.]").

22   [33] 20 C.F.R. § 404.1520(c).

23

process: 1) determining whether the claimant has a medically determinable impairment and 2), if so, determining whether the impairment is severe.[34]

Neither a claimant's statement of symptoms, nor a diagnosis, nor a medical opinion sufficiently establishes the existence of an impairment.[35] Rather, "a physical or mental impairment must be established by objective medical evidence from an acceptable medical source."[36] Evidence obtained from the "application of a medically acceptable clinical diagnostic technique, such as evidence of reduced joint motion, muscle spasm, sensory deficits, or motor disruption" is considered objective medical evidence.[37] If the objective medical signs and laboratory findings demonstrate the claimant has a medically determinable impairment,[38] the ALJ must then determine whether that impairment is severe.[39]

---

[34] *Id.* § 404.1520(a)(4)(ii).

[35] *Id.* § 404.1521.

[36] *Id.*

[37] 3 Soc. Sec. Law & Prac. § 36:26, Consideration of objective medical evidence (2019). *See also* 20 C.F.R. § 404.1513(a)(1).

[38] "Signs means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [a claimant's] statements (symptoms)." 20 C.F.R. § 404.1502(l).

[39] *See* Soc. Sec. Ruling (SSR) 85-28 at *3 (1985).

The severity determination is discussed in terms of what is *not* severe.[40] A medically determinable impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work."[41] Because step two is simply to screen out weak claims,[42] "[g]reat care should be exercised in applying the not severe impairment concept."[43]

### 2.    The ALJ's Findings

Here, the ALJ articulated that basic work activities are the ability and aptitudes necessary to do most jobs and cited the following examples: Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting.[44]

The ALJ then articulated her consideration of the medical records, stating:

> As to the claimant's reported physical deficits, the record shows that the claimant fractured her right ankle prior to the period at issue in

---

[40] *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).

[41] *Id.*; *see* SSR 85-28 at *3.

[42] *Smolen*, 80 F.3d at 1290.

[43] SSR 85-28 at *4.

[44] AR 18.

DISPOSITIVE ORDER - 10

2003. Hardware required for the fracture was later removed in 2005 (see Hearing Testimony; 6F). Imaging has shown some limited degenerative changes of the spine as well. Imaging of the lumbar spine from February of 2012 was unremarkable except for "very subtle suspected" vertebral body height loss of T12 (2F/2). Later imaging of the lumbar spine from September of 2014 revealed loss of disc space height at L5-S1 (22F/105). She was also diagnosed with chronic pain syndrome (22F/90) and used such medications as oxycodone to help with ongoing complaints of pain (22F/108).

The claimant had bouts of herpes zoster and cellulitis (see 19F/150; 22F/41). She had hypertension and hypercholesterolemia, and she was placed on lisinopril and lovastatin for these conditions (19F/86). She was prescribed Lasix to control lower extremity edema (2F/81). The record details a history of irritable bowel syndrome (see 22F/43), and the claimant was treated for acute encephalopathy in September of 2015 in the context of suspected accidental overdose on her medications (19F/72, 76, 82). The claimant also became obese during the period at issue with a body mass index rising up to about 32 in January of 2016, which is consistent with class I obesity (22F/40). SSR 19-2p has been considered in determining the severity of obesity.

In spite of her conditions and reports of pain, the record does not show that these conditions significantly limited the ability to perform basic work-related activities for 12 consecutive months during period at issue. The claimant did not require any musculoskeletal surgery during the relevant period, and there is no imaging of the right ankle from the relevant period suggesting any significant complications involving the right ankle post hardware removal in 2005. She also did not require any regular physical therapy for complications related to her conditions or undergo any regular injections to control back pain.

While she had herpes zoster and cellulitis, the record does not show that she required significant treatment with a specialist for these conditions, and her herpes zoster was treatable with medication (see 19F/145). Further, outside the summer of 2015 between June and August of 2015 (see 22F/81, 89), the record does not demonstrate any consistent issues with edema upon examination, let alone for any 12-month duration (see 19F/85; 22F/41, 81, 112-13), which does not fully support her allegations.[45]

---

[45] AR 19-20.

DISPOSITIVE ORDER - 11

The ALJ went on to reason:

Thus, in considering the record as a whole, including the rather
conservative course of treatment for musculoskeletal issues; the lack
of consistent edema upon examination over any 12-month period; the
lack of regular treatment with specialists for her skin or bowl issues;
her acknowledgement of being able to go on mile long walks, perform
her own activities of daily living, and handle the demands of her pawn
shop work requiring her to be on her feet all day; and the medical
records demonstrating that the claimant had normal gait and station,
negative straight leg raise testing, normal strength, intact sensation,
normal heart sounds, a non-tender and non-distended abdomen, good
musculoskeletal motion, and no focal deficits, I have found that the
claimant's physical impairments are all non-severe.[46]

3.    Relevant Medical Records

On February 12, 2014, Plaintiff presented to Gary Knox, MD, for follow-up
for chronic pain management.[47] Dr. Knox noted that Plaintiff was off hydrocodone
and taking her lowest dosage of oxycodone but that attempts to wean her down
further were not possible due to increased pain in the cold weather.[48] Dr. Knox
diagnosed chronic pain syndrome and anxiety and depression, and advised Plaintiff
that he would try to wean her oxycodone dosage down in the spring.[49] On May 12,

---

[46] AR 21.

[47] AR 1557.

[48] *Id.*

[49] AR 1559.

DISPOSITIVE ORDER - 12

2014, Plaintiff presented to Dr. Knox for follow-up.[50] Dr. Knox spoke with Plaintiff regarding weaning her down on pain medication but Plaintiff was not sure she wanted to, as the medication made it easier to function and she was working part-time.[51] Dr. Knox diagnosed back pain and joint pain in the foot and ankle, but opined that there should be no ongoing need for pain medication for the foot and ankle although "pain persists, no change" and recommended that Plaintiff should be referred to "physiatry consultation to aid in other modalities of treatment for her back."[52] Dr. Knox also noted that Plaintiff's depression had worsened after her Cymbalta was stopped due to insurance coverage issues.[53]

On August 11, 2014, Plaintiff presented to Dr. Knox for follow-up after an ER visit for painful rash she developed on her right forearm that spread to her lower leg, right upper arm, and left elbow.[54] ER staff believed it to be either bedbugs or shingles and treated Plaintiff with pain medication.[55] Dr. Knox swabbed the lesions and cultured for test for herpes.[56]Dr. Knox diagnosed infected

---

[50] AR 1545.

[51] *Id.*

[52] AR 1547.

[53] *Id.*

[54] AR 1541.

[55] *Id.*

[56] AR 1542.

foot and toe blisters, and herpes simplex, and recommended antibiotics until the cultures came back to confirm herpes simplex.[57]

On August 21, 2014, Plaintiff presented to Dr. Knox for evaluation of her chronic back pain. [58]Plaintiff reported pain since an auto accident 9 years prior with diffuse pain in the lumbar, paraspinal, and bilateral trapezius areas.[59] She reported the pain was aching and stabbing; worsened with standing, walking, and carrying objects; and better when sitting or lying down.[60] Plaintiff reported that she was able to function in her job at a pawn shop, but that her pain was much worse after working, and that she tried to walk one mile three times a week.[61] On examination range of motion was full, but Plaintiff had tenderness to palpation in the thoracic and lumbar paraspinals and had myofascial tenderness in the bilateral upper trapezius.[62]

On September 3, 2014, Plaintiff presented to Dr. Knox for follow-up appointment for chronic back pain.[63] Plaintiff reported that she had started a new

---

[57] *Id.*

[58] AR 1530.

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] AR 1533.

[63] AR 1527.

job in a pawn shop but it was a lot of bending and lifting.[64] Plaintiff also had a painful rash suggestive of herpes or shingles.[65] Dr. Knox assessed chronic pain syndrome, as well as anxiety and depression.[66]

On December 24, 2015, Plaintiff presented to Dr. Knox for a routine pain management appointment.[67] Plaintiff reported that her pain medication was stolen and that she had started a new job as a bookkeeper for a construction company because her job at the pawn shop was too physical.[68]

On April 2, 2015, Plaintiff presented to Dr. Knox for follow-up after a recent hospitalization.[69]Plaintiff was seen in the ER and was assessed with shingles due a painful rash, as well as nausea, vomiting, and diarrhea.[70] On examination, Dr. Knox noted that there was continued dermatomal type neuralgia and prescribed Lyrica in addition to the Oxycontin and Oxycodone prescribed for her

---

[64] *Id.*

[65] *Id.*

[66] AR 1528.

[67] AR 1522.

[68] *Id.*

[69] AR 1515.

[70] *Id.*

DISPOSITIVE ORDER - 15

chronic pain.[71] Dr. Knox diagnosed postherpetic neuralgia.[72] Dr. Knox diagnosed back pain, consistent with myofascial etiology; sacroiliitis, and chronic pain syndrome.[73]

On May 18, 2015, Plaintiff presented to Dr. Knox for a follow-up for chronic pain.[74] Dr. Knox believed she was having postherpetic pain in her back, and supplied Oxycontin.[75]

On June 17, 2015, Plaintiff presented to Dr. Knox for follow-up regarding her chronic pain in the low back and right ankle.[76] Dr. Knox noted that Plaintiff's pain had waxed and waned but since a recent case of shingles she had suffered what he believed to be postherpetic neuralgia and had also developed edema in her extremities and face after being prescribed Lyrica.[77] On examination, Plaintiff had pitting edema in her ankles and a weight gain of 10 pounds.[78] Dr. Knox diagnosed

---

[71] AR 1516.

[72] *Id.*

[73] AR 1520.

[74] AR 1512.

[75] *Id.*

[76] AR 1508.

[77] *Id.*

[78] AR 1509.

chronic pain syndrome, postherpetic neuralgia, and peripheral edema.[79]

On August 21, 2015, Plaintiff presented to the Rockwood South Valley Clinic, requested Dr. Knox, but was seen by Angella Julagay, ARNP.[80] Plaintiff reported that she had been scratched by her cat and was due for a tetanus booster; that she had re-occurring swelling in her lower legs and abdomen that did not resolve after 3 doses of Lasix; chronic back pain that had been exacerbated by postherpetic neuralgia and abdominal swelling; and a worsening of the chronic rash on her hands.[81] On examination, there was trace right and left pretibial edema, and pain on palpation and stiffness over the paraspinous muscles, but no SI joint tenderness, normal range of motion, normal strength, and intact sensation and Plaintiff's affect was depressed.[82] Plaintiff was assessed with edema, back pain, and rash, and was advised to elevate her legs in the evening and limit her salt intake, continue on Oxycontin and sign a pain contract, and to see a pain specialist.[83]

On September 24, 2015, Plaintiff presented to the Rockwood South Valley Clinic for follow-up care after a hospital admission from September 18, 2015, to

---

[79] AR 1510.

[80] AR 1497.

[81] *Id.*

[82] AR 1501.

[83] AR 1501-1502.

September 20, 2015, for encephalopathy and rhabdomyolysis.[84] Plaintiff reported that she was sick and might have accidentally taken too much of her pain medication but said that her symptoms had resolved.[85] ARNP Julagay assessed rhabdomyolysis, acute kidney failure, and chronic pain syndrome, and recommended referral to Dr. Jamie Lewis for pain management.[86]

On October 12, 2015, Plaintiff presented to ARNP Julagay, for an initial consult for acute renal failure following an admission at SHMC for renal failure and altered mental state.[87] ARNP Julagay reviewed Plaintiff's medical file and noted that at admission Plaintiff had blood pressure of 183/82, BUN of 49, creatinine of 3.8, CPK of 581, and that an MRI showed slight brain atrophy, and that at discharge her CPK was 208, her creatinine was 0.53 and her BUN was 10.[88] ARNP Julagay assessed acute kidney failure, which she opined was the result of NSAIDs, ACEI, and poor PO intake; hypertension; rhabdomyolysis; hyperlipidemia; impaired fasting glucose; and nicotine addiction.[89] Plaintiff was

---

[84] AR 1489.

[85] *Id.*

[86] AR 1493.

[87] AR 1475.

[88] *Id.*

[89] AR 1481-1482.

instructed to avoid NSAIDS and limit sodium intake.[90]

On October 22, 2015, Plaintiff presented to ARNP Julagay for a follow-up regarding shingles pain and reported chronic back pain with continued flares from her shingles outbreak. [91]ARNP Julagay noted past failed treatment with Lyrica, Gabapentin, and Cymbalta, and noted that a plan was in place to refer Plaintiff to a pain specialist.[92] On examination, Plaintiff had a benign nevus and there was pain on palpation and stiffness over the paraspinous muscles but no SI joint tenderness, normal range of motion, normal strength, intact sensation, and negative SLR.[93] Plaintiff was assessed with chronic pain syndrome and postherpetic neuralgia and continued on her pain contract.[94]

On November 24, 2015, Plaintiff presented to ARNP Julagay due to back pain and to check a mole.[95] Plaintiff reported that she had noticed the mole 3-4 months prior and that her back pain flared up recently due to cold weather, but was improved with heat and stretching.[96] ARNP Julagay noted that she was trying

---

[90] AR 1482.

[91] AR 1469.

[92] *Id.*

[93] AR 1473.

[94] AR 1473-1474.

[95] AR 1463.

[96] *Id.*

to find a pain specialist who took Plaintiff's insurance.[97] On examination, Plaintiff had a benign nevus and there was pain on palpation and stiffness over the paraspinous muscles but no SI joint tenderness, normal range of motion, normal strength, intact sensation and negative SLR.[98] Plaintiff was assessed with a nevus and low back pain.[99]

On January 22, 2016, Plaintiff presented to ARNP Julagay with complaints of a painful rash on her right forearm getting progressively worse.[100] ARNP Julagay noted that Plaintiff has a history of getting "herpes' rashes on her back, mouth, and genital area when stressed and that past prescriptions for Lyrica and Gabapentin caused side-effects.[101] Plaintiff was assessed with herpes zoster and cellulitis of the right arm.[102]

On July 12, 2016, Plaintiff presented to ARNP Julagay for a follow-up for chronic back pain.[103] She was due for a drug screening and prescription for Oxycontin and Oxycodone but she was concerned that she would run out of pills

---

[97] *Id.*

[98] AR 1467.

[99] *Id.*

[100] AR 1457.

[101] *Id.*

[102] AR 1461-1462.

[103] AR 1450.

because she was taking more due to a recent shingles outbreak, for which she was seen in the ER.[104] Plaintiff also notified ARNP Julagay of an ER prescription for hydrocodone but said she had not filled the prescription because she had a pain contract.[105]Plaintiff was assessed with chronic pain syndrome, herpes zoster, and peripheral edema.[106]

On August 24, 2016, Plaintiff presented to ARNP Julagay for follow-up after ER treatment for a shingles outbreak and folliculitis on her right arm.[107] ARNP Julagay noted that this was a recurrent issue which seemed to be triggered by stress.[108] Plaintiff reported she had run out of Oxycodone and Oxycontin early because of the outbreak and was experiencing mild withdrawal symptoms.[109] Plaintiff was diagnosed with: cellulitis, herpes zoster, hypertension, acute kidney failure, rhabdolyolysis, rash, edema, postherpetic neuralgia, sacroiliitis, infected foot and toe blisters, impaired fasting glucose, peripheral edema, chronic pain syndrome, knee pain, low back pain, herpes simplex, acute gastroenteritis, blisters, fractured ankle, ankle and foot joint pain, benign hypertension, hyperlipidemia,

---

[104] *Id.*

[105] *Id.*

[106] AR 1454-1455.

[107] AR 1444.

[108] *Id.*

[109] *Id.*

nevus, anxiety and depression, GERD, herpes genitalis, goiter, irritable bowel syndrome, and nicotine addiction.[110] Plaintiff's pain contract was continued and she was prescribed Norco tablets.[111] ARNP Julagay assessed Plaintiff with herpes zoster, folliculitis, and chronic pain syndrome, deteriorated.[112]

On November 29, 2016, Plaintiff presented to ARNP Julagay with complaints of right sided sciatic pain radiating down her right leg with numbness and tingling, but no weakness.[113] She reported using heat and ice with no improvement and said she was taking more Oxycodone than usual because of her increased back pain as well as pain from an infected tooth.[114] On examination there was pain on palpation and stiffness over the paraspinous muscles and a positive SLR, but no SI joint tenderness, normal range of motion, normal strength, and intact sensation.[115] Plaintiff was anxious.[116] Plaintiff was assessed with sacroiliitis and dental root caries, and was given a Medrol dosepak and a prescription for hydrocodone for her breakthrough pain but was not given an extra prescription for

---

[110] AR 1445.

[111] AR 1445, 1449.

[112] AR 1448.

[113] AR 1429.

[114] *Id.*

[115] AR 1433.

[116] *Id.*

1    oxycodone.[117]

2        On December 21, 2016, Plaintiff presented to ARNP Julagay for a one month

3    follow-up for low back and sciatic pain.[118] Plaintiff reported that her back pain was

4    better overall and that it no longer radiated into her leg, but that she continued to

5    get sharp pains if she vacuumed or stood for more than 10 minutes.[119] On

6    examination there was pain on palpation and stiffness over the paraspinous

7    muscles but no SI joint tenderness, normal range of motion, normal strength,

8    intact sensation, and negative SLR.[120]

9        4.    <u>Analysis</u>

10       The ALJ articulated that she considered that Plaintiff had a conservative

11   course of treatment for her musculoskeletal issues; lacked regular treatment with a

12   specialist for her skin or bowel issues; lacked consistent edema on examination,

13   reported a fuller range of daily activities; and on examination showed full strength,

14   full range of motion, normal gait, and intact sensation.

15       The ALJ's analysis is flawed for several reasons.  First, the ALJ erred in her

16   finding that Plaintiff's care for her musculoskeletal issues was "conservative."  The

17   record is clear that Plaintiff sought care for her musculoskeletal issues regularly,

18   _____

19   [117] AR 1433-1434.

20   [118] AR 1422.

21   [119] *Id.*

22   [120] AR 1426.

23

first with Dr. Knox, and after his departure from the clinic, with ARNP Julagay.

Moreover, Plaintiff was prescribed oxycodone and Oxycontin (morphine) for her

chronic pain issues.  Narcotic pain medication in general, and Oxycontin

specifically, are highly regulated medications and for the duration of her treatment

Plaintiff was under pain medication contracts with Dr. Knox and ARNP Julagay

which prohibited her from taking any other pain medication without their

permission.

The ALJ is correct that "evidence of 'conservative treatment' is sufficient to

discount a claimant's testimony regarding severity of an impairment."[121]  The

Ninth Circuit Court of Appeals has found that ablations, injections,

and narcotic pain medication are the exact opposite of conservative treatment.[122]

---

[121] *Parra v. Astrue*, 481 F.3d 742, 750–51 (9th Cir. 2007) (upholding the rejection of

the claimant's pain-severity testimony where the ALJ "noted that [the claimant]'s

physical ailments were treated with an over-the-counter pain medication").

[122] *See Lapeirre-Gutt v. Astrue*, 382 Fed. App'x 662, 664 (9th Cir. 2010) (doubting

whether "copious amounts of narcotic pain medication" as well as nerve blocks and

trigger point injections was "conservative" treatment); *Huber v. Berryhill*, 732 F.

App'x 451, 456-57 (7th Cir. 2018) (rejecting an ALJ's characterization of a

claimant's treatment as conservative where it included radiofrequency

ablation); *Christine G. v. Saul*, 402 F. Supp. 3d 913, 926 (C.D. Cal. 2019) ("Many

courts have previously found that strong narcotic pain medications and

DISPOSITIVE ORDER - 24

1    Moreover, both Dr. Knox and ARNP Julagay opined that Plaintiff should be treated

2    by a pain specialist and attempted at least once to refer Plaintiff to one before

3    finding that her insurance limited referral.[123]

4        Similarly, the ALJ's reasoning that Plaintiff did not seek regular treatment

5    with a specialist for her "skin issues" is not supported by the record.  The ALJ's

6    characterization of the lesions that Plaintiff suffered as a result of shingles and

7    post-herpetic neuralgia are neurological in character and not "skin" issues.[124]

8    Postherpetic neuralgia, which causes burning pain in nerves and skin is the most

9    common complication of shingles and lasts anywhere from weeks to years after the

10   initial shingles infection has ended.[125]

11       The ALJ's citation to Plaintiff's short-term work at a pawn shop as evidence

12   that she had no severe impairment is curious, given the fact that she found on the

13   record that it was "short lived" and agreed with Plaintiff's counsel that the attempt

---

spinal epidural injections are not considered to be 'conservative' treatment.")
(collecting cases); and *Harrison v. Astrue*, 2012 WL 527419, at *7 (D. Or. Feb. 16,
2012) (treatment including narcotic medications, nerve blocks and multiple steroid
injections "certainly not conservative").

[123] AR 1463, 1493, 1501.

[124] Mayo Clinic, *Postherpetic neuralgia*, www.mayoclinic.org (last viewed December 6, 2024.)

[125] *Id.*

to work in that position was an "unsuccessful work attempt."[126] Her citation to Plaintiff's statement that she wanted to walk three times a week but was no longer able to is equally problematic insofar as it established not what Plaintiff could do but what she could not.

The record indicated that Plaintiff was able to complete only the most basic activities when taking narcotic pain medication and advised ARNP Julagay that her pain increased when she stood for longer than 10 minutes or vacuumed.[127] Context is crucial as "treatment records must be viewed in light of the overall diagnostic record."[128]

The error was consequential because the ALJ limited her analysis to the first two steps of the five-step evaluation and did not complete it.   The Court concludes that the case should be remanded and the ALJ should be directed to consider all evidence of Plaintiff's impairments.

**B.    Medical Opinions: Plaintiff established consequential error.**

Plaintiff argues the ALJ erred in relying upon the testimony of the medical expert, Dr. Goldstein.  Although the Court has remanded the case for consideration of Plaintiff's musculoskeletal and neurological impairments, it will address this issue to provide guidance in later proceedings.

---

[126] 36,

[127] AR 1422.

[128] *Ghanim*, 763 F.3d at 1164.

Plaintiff argues that the ALJ erred in relying upon Dr. Goldstein's opinions. The Court concludes that the ALJ did not err in relying on Dr. Goldstein's opinions that Plaintiff's conditions did not meet or equal a listing but did err in interpreting Dr. Goldstein's statements to mean that Plaintiff did not have a severe physical impairment.

1.    Dr. Goldstein's testimony

Dr. Goldstein testified that he is board certified in internal medicine and pulmonary disease.[129] He said that he reviewed the medical record from Exhibit 1F up to and including Exhibit 25F, that he had never examined Plaintiff, and that he was a licensed physician who would testify impartially.[130] Dr. Goldstein said that the record showed that Plaintiff had surgery on her right ankle in 2003 and that the screws were removed in 2005, but she was not limited at the time by the injury.[131] He stated that she had low back pain, and degenerative joint changes at L5-S1 but that any limitations seemed to begin when she fractured her left ankle, after February 2, 2014.[132] He said that there seemed to be no limitations prior to 2016, and that in 2018 a CE was conducted but she was found to have no limitations even after consideration of her back pain, ankle surgery, and removal of

---

[129] AR 39.

[130] AR 39-40.

[131] AR 40.

[132] AR 40-41.

the screws.[133] He said that her use of a walker or scooter happened after the date last insured and opined that prior to the date last insured she did not meet or equal a listing.[134]

When asked whether Plaintiff's back condition was a severe impairment from 2014 through 2016, Dr. Goldstein stated that she had degenerative joint changes and L5-S1 narrowing in X-Ray but no MRI to indicate "any other significant disease."[135] The ALJ then stated that she would like to summarize the medical record because she "spent a good deal of time on it, and probably time [sic] than [you] would ever have available to review these records."[136] The ALJ then gave her own summarization of the medical records.[137] She then noted the 2018 evaluation by Dr. Sakamoto-Chun finding no limitations and asked if there were any severe impairments that pre-exist the date last insured.[138] Dr. Goldstein stated that there was pain but that pain alone does not meet or equal a listing and that he considered Listing 1.15 but that Plaintiff had no focal deficits, cranial nerves were intact, and she had normal sensation, muscle strength, and

---

[133] AR 41.

[134] *Id*.

[135] AR 41-42.

[136] AR 42.

[137] AR 42-47.

[138] AR 47.

coordination so there was no evidence of a severe abnormality.[139]

The ALJ then asked Dr. Goldstein if there were any impairments that he believed would meet or equal a listing or be "work preclusive."[140] Dr. Goldstein stated that he did not believe so based on the treatment notes in Exhibit 22F.[141] When asked by Plaintiff's attorney about post-herpetic (shingles) neuralgia, Dr. Goldstein stated that there was negative straight leg-raising and no visible deformities and only some stiffness over the paraspinous muscles.[142] When asked if it could reasonably produce pain, Dr. Goldstein responded that it would not meet a listing but could "cause some difficulty."[143] He stated that shingles can cause "a lot of pain' and residual pain after it has resolved, but there were normal neurologic findings, range of motion and strength and it would not meet the listing for peripheral neuropathy.[144]

2.    <u>Medical records</u>

The Court recited the relevant treatment notes from the medical record when rendering it's finding as to the ALJ's error at step two.  Those records are

---

[139] AR 47-48.

[140] AR 48.

[141] AR 48.

[142] AR 48-49.

[143] AR 50.

[144] *Id.*

hereby incorporated by reference.

3.    Standard

The ALJ must consider and articulate how persuasive he found each medical opinion and prior administrative medical finding, including whether the medical opinion or finding was consistent with and supported by the record.[145] The factors for evaluating the persuasiveness of medical opinions include, but are not limited to, supportability, consistency, relationship with the claimant, and specialization.[146] Supportability and consistency are the most important factors.[147] When considering the ALJ's findings, the Court is constrained to the offered by the ALJ.[148]

4.    Analysis

Plaintiff argues that the ALJ erred in relying upon Dr. Goldstein's opinion that Plaintiff did not have a severe impairment. The Commissioner argues that the ALJ explained that Dr. Goldstein had an opportunity to review the medical record and supported his opinion by detailing a lack of evidence.

The Court's concern regarding Dr. Goldstein's testimony is that when asked

---

[145] 20 C.F.R. §§ 404.1520c, 416.920c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

[146] 20 C.F.R. § 404.1520c(c)(1)–(5).

[147] 20 C.F.R. § 404.1520c(b)(2).

[148] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

whether Plaintiff had a severe impairment he consistently explained his opinion that she did not by stating that pain did not meet or equal a listing.[149] When the ALJ sought to clarify Dr. Goldstein's opinion, she asked whether in his opinion Plaintiff had severe impairments that would meet or equal a listing or have functional limitations that would be "work preclusive."[150] This is error because a limitation need not be "work preclusive" to be severe for purposes of a step-two evaluation.

Later, when asked by Plaintiff's counsel whether post-herpetic neuralgia could cause pain, Dr. Goldstein responded that, "Well, it can, but that by itself is not going to meet any listing but it can cause some difficulty, yes."[151] When asked again about Plaintiff's post-herpetic neuralgia, Dr. Goldstein stated that, "It's a pain producing thing. Herpes can leave you with some neuralgia, with some pain, but again it does not qualify to meet a peripheral neuropathy like you find in 11.14.[152]

On remand, the ALJ should seek medical expert testimony regarding the expected limitations from Plaintiff's physical conditions including her postherpetic neuralgia and chronic pain syndrome.

---

[149] AR 41, 47

[150] AR 48.

[151] AR 49-50.

[152] AR 50.

**C.    Symptom Reports: The Court Finds the Issue Moot**

Plaintiff argues the ALJ failed to properly assess her subjective complaints. As discussed above, the ALJ erred at step two and failed to properly evaluate the medical opinions.  Because the ALJ's erroneous evaluation of the medical evidence and the medical opinions impacted her evaluation of the Plaintiff's subjective reports, the ALJ is to reevaluate Plaintiff's symptom reports on remand.

**D.    Remand for Further Proceedings**

Plaintiff submits a remand for payment of benefits is warranted. The decision whether to remand a case for additional evidence, or simply to award benefits, is within the discretion of the court."[153] When the court reverses an ALJ's decision for error, the court "ordinarily must remand to the agency for further proceedings."[154]

The Court finds that further development is necessary for a proper disability determination. Here, it is not clear what, if any, additional limitations are to be added to the RFC. Therefore, the ALJ should consider whether testimony should be

_____

[153] *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v. Heckler*, 761 F.2d 530 (9th Cir. 1985)).

[154] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke*  379 F.3d at  595 ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).

received from a medical expert pertaining to Plaintiff's physical impairments, and then consider any additional evidence presented, and make findings at each of the five steps of the sequential evaluation process.

## IV.    Conclusion

Accordingly, **IT IS HEREBY ORDERED**:

1.    The ALJ's nondisability decision is **REVERSED**, and this matter is **REMANDED** to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

2.    The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 8 and 11**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 12th day of December, 2024.

_Edward F. Shea_

EDWARD F. SHEA
Senior United States District Judge